PLUMBERS & STEAMFITTERS LO-
CAL 773 PENSION FUND, Individual-
ly and on Behalf of All Others Simi-
larly Situated, Plaintiff,

v.

CANADIAN IMPERIAL BANK OF
COMMERCE, Gerald McCaughey,
Thomas D. Woods, Brian G. Shaw,
and Ken Kilgour, Defendants.

No. 08 Civ. 8143(WHP).

United States District Court,
S.D. New York.

March 17, 2010.

Robert M. Rothman, Esq., Coughlin Stoia Geller Rudman & Robbins, LLP, Melville, NY, for Plaintiff.

Jay B. Kasner, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, for Defendant CISC.

Lawrence Jay Zweifach, Esq., Gibson, Dunn & Crutcher, LLP, New York, NY, for Individual Defendants.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Lead Plaintiff Plumbers & Steamfitters Local 773 Pension Fund (the "Pension Fund" or "Plaintiff") brings this putative securities class action lawsuit against Defendant Canadian Imperial Bank of Commerce ("CIBC") and four of its officers, Gerald McCaughey ("McCaughey"), Thomas D. Woods ("Woods"), Brian G. Shaw ("Shaw"), and Ken Kilgour ("Kilg-

our" and collectively the "Individual Defendants"), alleging that the Defendants misled investors about CIBC's exposure to fixed-income securities backed by subprime residential mortgages. The Pension Fund asserts that Defendants' false statements and omissions caused injury in violation of Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t(a), of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants move to dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, Defendants' motion is granted.

## BACKGROUND

### I. *The Parties*

The Pension Fund seeks to represent a class of all purchasers of CIBC securities on the New York Stock Exchange (the "NYSE") as well as U.S. persons who otherwise acquired a CIBC security between May 31, 2007 and May 29, 2008 (the "Class Period") and were damaged thereby. (Consolidated Class Action Complaint dated Feb. 20, 2009 ("Compl.") ¶¶ 1, 32.) Plaintiff purchased CIBC common stock during the Class Period. (Compl. ¶ 19.)

CIBC is a chartered Canadian bank whose securities are traded under the symbol "CM" on the NYSE and the Toronto Stock Exchange. (Compl. ¶ 20.) From August 2005 until the present, Defendant McCaughey has served as President and Chief Executive Officer ("CEO") of CIBC. (Compl. ¶ 21.) Defendant Woods was Senior Executive Vice–President and Chief Financial Officer ("CFO") during the Class Period before being reassigned in January 2008 to Chief Risk Officer. (Compl. ¶¶ 22, 208.) Defendant Shaw was Senior Executive Vice President and Chairman and CEO of CIBC World Markets, the company's investment banking arm. (Compl. ¶¶ 23, 72.) Defendant Kilgour was Senior Executive Vice–President and Chief Risk Officer. (Compl. ¶ 24.) Since the Class Period, CIBC has terminated Kilgour and Shaw. (Compl. ¶¶ 23–24.)

By virtue of their senior positions within the company, all of the Individual Defendants had access to the confidential and sensitive business information of CIBC. (Compl. ¶ 26.) Moreover, Plaintiff alleges that each of the Individual Defendants participated in and exercised some control over the drafting, preparation, and approval of various public, shareholder, and investment reports and had access to undisclosed adverse information harmful to CIBC. (Compl. ¶¶ 28–31.)

### II. *Mortgage–Backed Securities*

Plaintiff alleges that Defendants "immersed" CIBC in the U.S. mortgage-backed securities market and then misled CIBC investors about the company's holdings as the value of those assets plummeted. (Compl. ¶ 38.) In the late 1990s, mortgage interest rates in the United States declined, leading to increased demand for homes and a corresponding runup in home prices. (Compl. ¶ 41.) Aggressive and "oftentimes predatory" lenders extended credit to so-called "subprime" borrowers—i.e., persons with a high debt-to-income ratio. (Compl. ¶¶ 41, 44.)

By 2005, the increase in housing prices began to abate as interest rates increased. (Compl. ¶ 42.) To sustain a high volume of new mortgages, lenders offered "adjustable rate" plans to borrowers. (Compl. ¶ 42.) Lenders also extended "no income/no asset verification" loans for which borrowers were not required to substantiate their creditworthiness. (Compl. ¶ 45.) Such loans were classified as "non-prime" or "Alt–A" mortgages. (Compl. ¶ 45.)

These individual home loans were sold by the banks issuing them to third parties

who then securitized the assets. (Compl. ¶ 40.) Mortgage securitization is the pooling of thousands of loans to form the collateral for so-called residential mortgage-backed securities ("RMBS"). (Compl. ¶ 46.) RMBSs are issued as bonds in tranches ranging from "High Grade" (AAA- and AA-rated bonds) to "Mezzanine" (BBB- to B-rated bonds) to unrated. (Compl. ¶¶ 47–48.) When income is generated from the underlying home loans, it is paid over to the tranches according to bond seniority (High Grade being first). (Compl. ¶¶ 47–48.) If borrowers default on home loans and the amount of income generated by the pool of loans decreases, the lowest-rated tranches are the first not to receive payments. (Compl. ¶ 48.)

RMBSs can themselves be pooled for inclusion in a category of securitization known as a collateralized debt obligation ("CDO"). (Compl. ¶ 52.) CDOs are issued and rated in a manner similar to RMBSs, that is, by the priority of payments from the underlying collateral. (Compl. ¶ 52.) To protect, or "hedge," against default of an RMBS or CDO, the holder may purchase insurance known as a credit-default swap ("CDS"), through which the holder pays a counterparty to assume the risk of default. (Compl. ¶ 63.)

### III. CIBC's Mortgage–Backed Securities

In 2005, two years before the Class Period began, the first signs of a deteriorating U.S. housing market emerged—American home values declined, interest rates rose, and the mortgage default rate increased. (Compl. ¶¶ 85–86, 100.) As defaults rose, the revenue streams feeding RMBSs and, in turn, CDOs dried up. (Compl. ¶¶ 87, 99.) Plaintiff alleges that the impairment in the value of mortgage-backed securities was widely known because the decline was tracked by the ABX Index, an exchange for these securities, and was reported in the press. (Compl. ¶¶ 89, 98–99, 103–112.) By April 2007, press reports indicated that some of the $450 billion in subprime mortgage debt sold in 2006 had lost 37 percent of its value. (Compl. ¶ 111.)

By the beginning of the Class Period, CIBC had accumulated $11.5 billion in assets collateralized by subprime mortgage loans. (Compl. ¶¶ 73, 115.) Of that total, $9.8 billion was hedged. (Compl. ¶ 74.) CIBC hedged $3.5 billion through one counterparty known as ACA Financial Guaranty Corporation ("ACA Financial"). (Compl. ¶¶ 10, 74.)

The gravamen of this litigation is that CIBC, as owner of these securities in the midst of a U.S. mortgage crisis, misled investors about the firm's mortgage-backed holdings and its relationship with ACA Financial. (Compl. ¶¶ 113, 116.)

### IV. The Alleged False Statements and Omissions

#### a. May 2007 Release and Conference Call

On May 31, 2007—the start of the Class Period—CIBC issued a press release, incorporated into a Form 6–K filed with the SEC, regarding its second quarter 2007 financial results (the "Second Quarter 2007 Release"). (Compl. ¶ 128.) The Second Quarter 2007 Release did not specifically address the U.S. mortgage crisis but referred to pages 67 through 69 of the 2006 Annual Accountability Report (the "2006 Accountability Report") for off-balance sheet arrangements, which included the company's CDO exposure. (Compl. ¶ 131.) In the 2006 Accountability Report, CIBC stated, "Although actual losses are not expected to be material, as of October 31, 2006, our maximum exposure to loss as a result of involvement with the CDOs was approximately $729 million." (Compl. ¶ 132.) Plaintiff alleges that this reference and the statement that "there were no other significant changes to off-balance sheet arrangements for the three and six

months ended April 30, 2007" constituted "blatantly false and misleading" representations because CIBC's actual exposure to the U.S. real estate market was almost $12 billion. (Compl. ¶ 133.) Moreover, Plaintiff alleges that CIBC should have written down $2.15 billion of its mortgage-backed portfolio as of its Second Quarter 2007 Release. (Compl. ¶ 134.)

During a conference call on May 31, 2007 (the "May 31 Conference Call"), analysts pressed McCaughey and Shaw on CIBC's purchase of a $330 million mezzanine CDO known as Tricadia, which was a particularly poorly-performing subprime asset. (Compl. ¶ 137.) One analyst inquired whether CIBC had "other exposures" like Tricadia. (Compl. ¶ 137.) Shaw responded about the "total exposure" faced by CIBC as follows:

> I guess I would probably say to the extent we have exposure in this space it tends to be more synthetic than direct CDO exposure. We don't see this as a major revenue contributor currently to CIBC ... I guess I would just conclude by saying in summary our risks in this space is [sic] not at all major.

(Compl. ¶ 137.) Neither McCaughey nor Shaw stated CIBC's total RMBS or CDO exposure during the May 31 Conference Call. (Compl. ¶¶ 138–140.)

### b. *July 2007 Press Release*

On June 15, 2007, *Grant's Interest Rate Observer* published an article about subprime mortgages which questioned CIBC's total exposure to such assets and speculated that it might be $2.6 billion. (Compl. ¶ 145.) The article also wondered whether CIBC had additional Tricadia-like holdings and questioned the accuracy of Shaw's statement in the May 31 Conference Call that CIBC faced low risks with its mezzanine CDOs. (Compl. ¶ 145.) On July 10, 2007, CIBC responded to the speculation in the press by stating that "CIBC does not disclose individual securities positions but confirms its previous statement to the media that its unhedged exposure to this sector is well below U.S. $2.6 billion" (the "July 10 Press Release"). (Compl. ¶ 146.) Plaintiff alleges the July 10 Press Release was materially false and misleading for failing to disclose CIBC's true exposure of almost $12 billion and that its hedges on such exposure were guaranteed by financially unstable counterparties. (Compl. ¶ 147.)

### c. *August 2007 Pre–Release, Release, and Conference Call*

On August 13, 2007, CIBC pre-announced its third quarter 2007 financial results (the "Third Quarter 2007 Pre–Release"). (Compl. ¶ 157.) CIBC stated it expected to report "good revenue, expense and loan performance in most business groups, as well as higher than normal gains on securities and credit derivative hedges" in its third quarter 2007 financial results at the month's end. (Compl. ¶ 157.) The Third Quarter 2007 Pre–Release further detailed that CIBC expected mark-to-market write-downs on approximately $290 million of its structured credit business related to CDO and RMBS losses in the U.S. mortgage market. (Compl. ¶ 157.) The release also quoted McCaughey as asserting, "We had positive financial results in many areas which more than offset the Structured Credit write-downs." (Compl. ¶ 157.) CIBC further revealed its *unhedged* position in securities tied to U.S. mortgages:

> CIBC's exposure to [the U.S. residential mortgage market] before write downs is approximately U.S. $1.7 billion (excluding exposure directly hedged with other counterparties).... CIBC estimates that less than 60% of this exposure relates to underlying subprime mortgages, while the remainder is midprime and higher grade assets. The majority of the U.S. $1.7 billion exposure continues

to be AAA-rated, the highest rating category.

(Compl. ¶¶ 158–59.)

However, from June to August 2007, shares of ACA Financial, CIBC's hedge for $3.5 billion in securities, fell from $15.00 to $5.17 per share. (Compl. ¶ 148.) On August 4, 2007, one industry publication forecasted the financial demise of ACA Financial as well as "devastating" financial consequences for companies and banks guaranteeing securities through that firm. (Compl. ¶ 149.) Plaintiff alleges the Third Quarter 2007 Pre–Release was false and misleading for not disclosing the additional $9.8 billion in hedged exposure as well as information regarding ACA Financial's decline. Further, Plaintiff asserts "CIBC should have recorded a cumulative write-down of $5.65 billion ... instead of the $290 million write-down reported." (Compl. ¶¶ 160–61.)

On August 30, 2007, CIBC announced its third quarter 2007 financial results, which were later incorporated into the company's Form 6–K (the "Third Quarter 2007 Release"). (Compl. ¶ 165.) The Third Quarter 2007 Release contained the same information as the pre release regarding CIBC's exposure to the U.S. real estate market. (Compl. ¶¶ 166–67.) However, it also referenced off-balance sheet arrangements described in the 2006 Accountability Report. (Compl. ¶ 168.) During an earnings conference call that day (the "August 30 Conference Call"), Kilgour, Woods, and Shaw all made reference to the Third Quarter 2007 Release, and Woods represented that the firm was undertaking a "rigorous" review of the firm's mortgage-backed portfolio. (Compl. ¶ 173.) Later that day, Woods appeared on the Business News Network and characterized CIBC's portfolio as follows: "When the residential real estate market in the U.S. started to decline in June—July, we upped our efforts at looking at all of the CDO books.

We have very low exposure right now." (Compl. ¶ 175.)

### d. November 2007 Conference Call and Press Release

In a November 5, 2007 earnings conference call (the "November 5 Conference Call"), CFO Woods responded to an analyst's question about the quality of its RMBS and CDO hedges as follows: "We have provided a fair bit of detail on the unhedged positions, the hedges we have good counterparties [sic], and we are not going to go any further than that." (Compl. ¶ 180.) In autumn 2007, stories about the deteriorating financial condition of ACA Financial began to appear in the press. (Compl. ¶ 178.) At least one reporter predicted that ACA Financial would file for bankruptcy. (Compl. ¶ 178.) Plaintiff alleges that Woods' representation regarding "good counterparties" was materially misleading in light of CIBC's extensive exposure to ACA Financial. (Compl. ¶ 181.)

Four days later, CIBC issued a press release announcing that it expected an additional write-down of $463 million for the fourth quarter relating to exposure in the U.S. real estate market (the "November 9 Release"). (Compl. ¶ 182.) Plaintiff alleges this release was false and misleading because it understated the true impairment of the company's mortgage-backed portfolio. (Compl. ¶ 183.)

### e. December 2007 Release

On December 6, 2007, CIBC announced its fourth quarter results and revealed its hedged exposure to the U.S. housing market (the "Fourth Quarter 2007 Pre–Release"). (Compl. ¶ 184.) The Fourth Quarter 2007 Pre–Release stated:

In addition, we have exposures to the U.S. subprime residential mortgage market through derivative contracts which are hedged with investment-grade

counterparties. As of October 31, 2007, the notional amount of these hedged contracts was $9.3 billion and the related on-balance sheet fair value was $4.0 billion."

(Compl. ¶ 184.) In an analyst conference call (the "December 6 Conference Call"), McCaughey disclosed that 35 percent of the hedged exposure was with an "A-rated financial guarantor that has recently been placed on credit watch." (Compl. ¶ 187.) CIBC did not reveal that the guarantor was ACA Financial. (Compl. ¶ 188.) Analysts responded that the quality of the hedges on the debt was "much weaker than ... anticipated." (Compl. ¶ 192.) CIBC shares fell 8.4 percent over the next two trading days. (Compl. ¶ 193.)

### f. *ACA Financial's Bankruptcy and CIBC's Write–Downs*

On December 13, 2007, the NYSE announced that it would suspend trading of ACA Financial common stock before the market opened on December 18, 2007. (Compl. ¶ 198.) Because the market was freighted with speculation that ACA Financial was the unnamed insurer, Plaintiff alleges the NYSE announcement caused CIBC's shares to fall another 3.9 percent on December 14. (Compl. ¶¶ 198–99.) On December 17, an analyst downgraded CIBC from "stable" to "negative," precipitating a further 2.5 percent drop in share price. (Compl. ¶¶ 200–01.) On December 19, ACA Financial announced it was bankrupt. (Compl. ¶ 202.) That day, CIBC disclosed that ACA Financial was the unnamed hedge counterparty for $3.5 billion of its U.S. subprime real estate exposure and stated its belief that "there is a reasonably high probability that [CIBC] will incur a large charge in its financial results for the First Quarter ending January 31,

2008" (the "December 19 Release"). (Compl. ¶ 204.) CIBC's shares fell 2.5 percent following the December 19 Release. (Compl. ¶ 207.)

From January 2008 through the end of the Class Period on May 29, 2008, CIBC announced three separate write-downs related to the U.S. subprime mortgage market. (Compl. ¶¶ 210–226.) First, on January 14, 2008, the company issued a release detailing its write-down of $462 million of its unhedged mortgage-backed portfolio as well as a "fair value adjustment" of $2 billion to its hedged portfolio (the "January 14 Release"). (Compl. ¶ 210.) The January 14 Release further stated that "no additional material fair value adjustments are currently contemplated." (Compl. ¶ 211.) Plaintiff alleges the January 14 Release continued to mislead investors by "materially understat[ing] the impairment of CIBC's structured securities portfolio." (Compl. ¶ 212.) On February 28, 2008, CIBC announced its first quarter 2008 financial results, describing write-downs totaling $3,379 billion attributable to its subprime mortgage investments (the "First Quarter 2008 Release"). (Compl. ¶¶ 216–17, 220.) On May 29, 2008, the last day of the Class Period, CIBC reported its second quarter 2008 financial results and disclosed an additional $2.48 billion write-down (the "Second Quarter 2008 Release"). (Compl. ¶ 225.) CIBC shares closed at $70.20, an approximate 20 percent decline from the start of the Class Period. (Compl. ¶¶ 214, 225–26.)

### g. *Value at Risk Misrepresentation*

Plaintiff also alleges that CIBC misrepresented its measurement and management of risk using a key metric known as the "Value–at–Risk" ("VaR") indicator.[1]

---

**1.** "Value at risk" describes a general class of probabilistic models that measure the risk of loss in market risk sensitive instruments. These models measure the potential loss that could occur in normal markets, over a defined period, within a certain confidence level. VaR can measure the uncorrelated risks of single transactions or the correlated risks

(Compl. ¶¶ 117–19.) The Complaint contrasts the "miniscule size" of CIBC's VaR metric with figures from other financial institutions having significant RMBS exposure. Plaintiff alleges this disparity indicates CIBC's intent to mislead investors. (Compl. ¶ 121.) For example, CIBC's mortgage-backed portfolio was one-third as large as those of comparable financial institutions. Therefore, Plaintiff alleges, its VaR should have approximated one-third of other banks' VaRs. (Compl. ¶ 121.) Instead, CIBC's VaR figures were between 1/50 and 1/100 the magnitude of other firms. (Compl. ¶ 121.) The alleged misrepresentation occurred, in part, because CIBC based its VaR projections on overly optimistic bond default rates leading CIBC to understate its risk. (Compl. ¶ 122.)

### h. Defendants' Alleged State of Mind

Plaintiff premises its allegations on Defendants' knowledge or reckless disregard of internal CIBC documents and records controverting their public statements. (Compl. ¶ 227.) Further, Plaintiff alleges that Shaw, as head of CIBC World Markets, knew or should have known that CIBC's statements were false because "[s]ecurities and other instruments tied to subprime were core products, and a large revenue generators [sic], for CIBC World Markets." (Compl. ¶¶ 228–29.) According to Canadian newspaper reports, "from no later than mid-June 2007, McCaughey became an expert on the subject of CIBC's activities related to structured finance instruments and CIBC's exposure to the subprime market," and thus knew or should have known of the deteriorating market situation. (Compl. ¶ 230.) Plaintiff also alleges that Defendants' discussion of CIBC's subprime exposure, risk levels, and counterparty protection during the

Class Period suggests they knew or should have known the company's statements on those topics were false and misleading. (Compl. ¶ 231.) Plaintiff maintains the Statements of Financial Accounting Standards ("SFAS") Nos. 94 and 115 and Generally Accepted Accounting Principles (the "GAAP") required CIBC to write-down the value of the mortgage-backed securities earlier than it did. (Compl. ¶¶ 127, 233.)

### DISCUSSION

### I. Legal Standard

In reviewing a motion to dismiss, this Court accepts all material facts alleged in the complaint as true and construes all reasonable inferences in the plaintiff's favor. *ECA Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir.2009); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir.2008). Nonetheless, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted). To survive a motion to dismiss, the Court must find that the claim is more than mere suspicion, but rather rests on "factual allegations sufficient to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Determining whether a complaint states a plausible claim for relief will ... be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 110

---

of several different exposures in a portfolio. *See* U.S. Sec. & Exchange Comm'n, "Market Risk Disclosure FAQ," http://www.sec.gov/ divisions/corpfin/ guidance/derivfaq.htm (last visited Mar. 16, 2010).

(2d Cir.2009) (quoting *Iqbal*, 129 S.Ct. at 1953) (internal quotations omitted). In assessing whether the standard is met, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (citation omitted); *see also Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991).[2]

## II. *Section 10(b) and Rule 10b–5 Claim*

■ To state a claim for misrepresentation under Section 10(b) and Rule 10b–5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005)): *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 321, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A securities fraud complaint must further comply with the heightened pleading standard of Fed.R.Civ.P. 9(b), which requires that "the circumstances constitut-

ing fraud … shall be stated with particularity." *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). Thus, "[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001).

■ A well-pled scienter allegation "state[s] with particularity facts giving rise to a strong inference" that the defendants had "'a mental state embracing [the] intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319, 127 S.Ct. 2499 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)); *see also South Cherry*, 573 F.3d at 108 (adopting the Court's language in *Tellabs* ); *Teamsters*, 531 F.3d at 194. In addition, "the scienter element can be satisfied by a strong showing of reckless disregard for the truth." *South Cherry*, 573 F.3d at 109 (citations omitted). A reckless disregard for the truth means "conscious recklessness-i.e., a state of mind *approximating actual intent* and *not merely a heightened form of negligence.*" *South Cherry*, 573 F.3d at 109 (citing *Novak*, 216 F.3d at 312) (emphasis in original). Like any allegation of recklessness in tort, the plaintiff need only identify conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known

**2.** Plaintiff moves to strike twenty-one exhibits, internet sources, and news articles referenced in Defendants' motion to dismiss which were not referenced in the Complaint. On a motion to dismiss, a court is generally confined to considering the complaint, documents incorporated in the complaint, and matters of which the court may take judicial notice. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). The Court has reviewed the Defendants' supplemental documents and declines to consider them except to the limited extent that they inform the competing inference analysis required by *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 323–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("The strength of an inference cannot be decided in a vacuum.... To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct."); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F.Supp.2d 416, 421 n. 6 (S.D.N.Y.2003) (Pollack, J.) ("The Court may take judicial notice of the existence of the internet bubble and its subsequent crash." (citations omitted)).

to the defendant or so obvious that the defendant must have been aware of it." *South Cherry*, 573 F.3d at 109 (citing *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000)) (quotation marks omitted).

 There are four kinds of deceitful behavior that, if well-pled, support a "strong inference" of scienter: where the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *See Novak*, 216 F.3d at 311. However, "it is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *South Cherry*, 573 F.3d at 109 (citing *Novak*, 216 F.3d at 308); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996) ("if scienter could be pleaded on that basis alone, virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions"). Likewise, even an "egregious failure to gather information will not establish . . . liability as long as the defendants did not deliberately shut their eyes to the facts." *Hart v. Internet Wire, Inc.*, 145 F.Supp.2d 360, 368–69 (S.D.N.Y.2001) (Pollack, J.) (internal quotation marks and citations omitted).

 Moreover, the determination of an inference of scienter must not be conducted "in a vacuum." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. A court "must consider plausible nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499; *ATSI Comm'cns*, 493 F.3d at 99. In comparing competing explanations two adversaries offer for an event, the "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at *least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499 (distinguishing the balancing of inferences in a securities fraud claim with a motion for summary judgment under Rule 56) (emphasis added); *South Cherry*, 573 F.3d at 111 (applying the "competing inference" principles); *Teamsters Local 445*, 531 F.3d at 194; *ATSI Comm'cns*, 493 F.3d at 99.

#### a. *Defendants' Public Statements*

The Complaint makes specific allegations of misrepresentation with respect to at least fourteen statements or press releases made by Defendants during the class period; (1) the Second Quarter 2007 Release, (2) the May 31 Conference Call, (3) the July 10 Release, (4) the Third Quarter 2007 Pre-Release, (5) the Third Quarter 2007 Release, (6) the August 30 Conference Call, (7) the Business News Network Statements, (8) the November 5 Conference Call, (9) the November 9 Release, (10) the Fourth Quarter 2007 Pre-Release, (11) the December 6 Conference Call, (12) the January 14 Release, (13) the First Quarter 2008 Release, and (14) the Second Quarter 2008 Release. Plaintiff also alleges misrepresentation in the VaR measurement over the entirety of the Class Period.

Reviewing the entirety of the Complaint, there is no allegation that any Defendant benefited in "a concrete and personal" way from the purported fraud. *See Novak*, 216 F.3d at 311. Rather, the Complaint incorporates news releases which show that CIBC purchased approximately $300 mil-

lion of its own stock during the Class Period. Moreover, three of the four Individual Defendants also increased their holdings of CIBC stock during the Class Period. *See In re Bristol–Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 561 (S.D.N.Y.2004) (defendants' increase in company holdings during class period was "wholly inconsistent with fraudulent intent"). Indeed, the Defendants did not sell their stock just prior to a price drop— a fact suggesting the absence of any nefarious motives. *See In re Oxford Health Plans Inc. Sec. Litig.,* 187 F.R.D. 133, 139 (S.D.N.Y.1999) ("Trades made a short time before a negative public announcement are suspiciously timed."); *see also Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53–54 (2d Cir.1995). It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings and executive compensation. *See Kalnit,* 264 F.3d at 140–41. Because Plaintiff has not alleged that the Defendants had any "motive and opportunity to commit fraud," *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994), and the Complaint makes no allegations of deliberately illegal behavior by the Defendants, this Court turns to the third and fourth *Novak* categories regarding recklessness.

An inference of scienter may arise where the defendants "knew facts or had access to information suggesting that their public statements were not accurate ... or ... failed to check information they had a duty to monitor." *Novak,* 216 F.3d at 311. To make this showing, a complaint *"must specifically identify* the reports or statements" that are contradictory to the statements made. *Novak,* 216 F.3d at 309 (citing *San Leandro,* 75 F.3d at 812 (finding an unsupported allegation about the existence of a contrary sales report "insufficient to survive a motion to dismiss")) (emphasis added); *see also Teamsters Lo-*

*cal 445,* 531 F.3d at 196 (requiring a "high degree" of specificity).

Notably, the Complaint makes no reference to internal CIBC documents or confidential sources discrediting Defendants' assertions that they were only adapting to a "rapidly changing economic landscape" during a "once-in-a-century credit tsunami." Further, this Court notes that this action is not the first dispute to arise from the subprime mortgage crisis. *See In re 2007 Novastar Fin. Inc., Sec. Litig.,* 579 F.3d 878 (8th Cir.2009); *Kuriakose v. Fed. Home Loan Mortgage Co.,* 674 F.Supp.2d 483 (S.D.N.Y.2009) (alleged misrepresentation to investors about the soundness of the company's mortgage portfolio during subprime mortgage crisis); *Landmen Partners Inc. v. Blackstone Group, L.P.,* 659 F.Supp.2d 532 (S.D.N.Y.2009) (failure to disclose adverse information about significant exposure to subprime mortgage market). Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations. *See In re Oxford Health Plans,* 187 F.R.D. at 139 (finding (1) a verbal report from one defendant to another, (2) evidence of an emergency meeting to address the problem, (3) a report from an outside vendor regarding the problem, and (4) access to reports that the company's internal controls and accounting were not followed as factual grounds on which defendants' scienter could be inferred).

Plaintiff alleges perfunctorily that Defendants received information contradicting their public statements because they held management roles and monitored CIBC financial reports. However, that "broad reference to raw data" is not sufficient. *See Steinberg v. Ericsson LM Telephone Co.,* No. 07 Civ. 9615(RPP), 2008 WL 5170640, at *13–14 (S.D.N.Y. Dec. 10, 2008) ("[T]he Complaint identifies none of

this adverse information other than stating, generically, that it was contained in various 'internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports' and 'internal non-public reports' provided to Defendants.''). Plaintiff has not "specifically identified any reports or statements" or any dates or time frame in which Defendants were put on notice of contradictory information. *Teamsters Local 445,* 531 F.3d at 196 (citation omitted); *In re PXRE Group Ltd. Sec. Litig.,* 600 F.Supp.2d 510, 539 (S.D.N.Y.2009). Likewise, Plaintiff's contention that Shaw, as Chairman and CEO of CIBC World Markets, received contradictory information because he "was ultimately in charge of all CIBC's activities related to subprime exposure" is too general an allegation from which to conclude Shaw had actionable data alerting him to the falsity of his statements. Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight. *See In re Sotheby's Holdings, Inc.,* No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." (citations omitted)).

Even assuming these events put Defendants on notice of the subprime credit crisis as early as May 2007, knowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud. *See In re PXRE Group,* 600 F.Supp.2d at 540 ("it does not follow that the resultant generalized awareness of ... 'concerns' made it reckless for the Individual Defendants to rely on the prepared loss estimate reports").

Despite opportunistic rummaging through press releases and internal company documents, Plaintiff buttresses its allegation only with citations to newspaper and magazine articles and the website *The Motley Fool,* http://www.fool.com. Although a plaintiff may use such sources in pleadings, "the news articles cited still must indicate particularized facts about a defendant's conduct in order to support [the] claims." *Miller v. Lazard, Ltd.,* 473 F.Supp.2d 571, 586 (S.D.N.Y.2007). With just one exception, the media reports on which Plaintiff relies provide only generalized forecasting and speculation about a looming subprime crisis.

The June 15, 2007 *Grant's Interest Rate Observer* article stands alone in reporting particularized facts about the Tricadia investment and CIBC's exposure to mezzanine CDOs. Yet CIBC responded to that article in its July 10 Release, stating that its unhedged investments were less than the reported $2.6 billion. Moreover, the Complaint acknowledges that CIBC's actual unhedged exposure was only $1.7 billion. *See* Compl. ¶ 115. Thus, Plaintiff offers no specific facts on which to infer an intent to deceive through the July 10 Release. Nor does Plaintiff identify any obligation requiring Defendants to make a complete disclosure of all CIBC's mortgage-backed holdings.

More broadly, Defendants were not obligated to respond to every potentially disparaging news story or to rebut the musings of the financial press. *See In re Omnicom Group, Inc. Sec. Litig.,* 597 F.3d 501, 514 (2d Cir.2010) ("Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press or even by directors."); *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1259 (S.D.N.Y. 1991) ("Plaintiffs have stitched together a patchwork of newspaper clippings and pro-

claimed the result a tale of securities fraud. . . . Read as a whole, the complaint creates the strong impression that when [the defendant] announced a cut in dividends, plaintiff's counsel simply stepped to the nearest computer console, conducted a global Nexis search, [and] pressed the 'Print' button."). The securities laws do not require—and good business practice does not suggest—that financial institutions respond to every warble of the 24-hour news cycle.

■■■ Plaintiff also seeks to engraft a conscious intent to mislead onto the erroneous quantitative prediction—the VaR. That effort is unavailing. Even assuming the VaR metric was neither forward-looking nor accompanied by appropriate cautionary language, Plaintiff cannot show the VaR calculations were both objectively and subjectively false. *See In re Salomon Analyst Level 3 Litig.*, 373 F.Supp.2d 248, 251 (S.D.N.Y.2005) ("The Court rejects plaintiffs' characterization of valuation models as 'fact' rather than 'opinion.' "). Adopting Plaintiffs calculus, CIBC's VaR metric was *objectively* inaccurate, but Plaintiffs do not allege that Defendants knew of the error and used it to mislead others. One cannot reasonably conclude that, because the VaR calculations were mistaken, Defendants had the subjective intent to defraud.

Under the *Tellabs* "comparative" inquiry, the inference Plaintiff asks this Court to draw from CIBC's statements must be considered against "cogent" and "compelling" alternative explanations for a deficiency. *See* 551 U.S. at 323–24, 127 S.Ct. 2499. The Complaint describes an unprecedented paralysis of the credit market and a global recession. Major financial institutions like Bear Stearns, Merrill Lynch, and Lehman Brothers imploded as a consequence of the financial dislocation. Looking back, a full turn of the wheel would have been appropriate. That CIBC chose an incremental measured response, while erroneous in hindsight, is as plausible an explanation for the losses as an inference of fraud. *See In re PXRE Group*, 600 F.Supp.2d at 546. CIBC, like so many other institutions, could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight— "[t]aking the time necessary to get things right is both proper and lawful." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir.2007) ("Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430–31 (3d Cir.1997)(Alito, J.).

### b. *Write–Downs on CIBC's Mortgage– Backed Holdings*

■■■ Plaintiff also alleges that Defendants intentionally or recklessly failed to take timely write-downs on CIBC's mortgage-backed securities. The Complaint asserts that CIBC should have recorded much larger write-downs earlier than it did. Because the securities laws do not allow fraud by hindsight claims, after-the-fact "allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53; *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). "If all that is involved is a dispute about the timing of the writeoff . . . we do not have fraud; we may not even have negligence." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Rather, the inquiry remains framed by the recklessness standard—that is, whether the failure to take a write-down amounted to "highly unreasonable [conduct] which represents an extreme departure from the standards of ordinary care." *South Cherry*, 573 F.3d at 109 (citing *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000)) (quotation marks omitted); *see also Kriendler v. Chem. Waste Mgmt., Inc.*, 877

F.Supp. 1140, 1153 (N.D.Ill.1995) ("[T]he standard is whether the need to write-down ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." (quotation marks omitted)).

■ As with Defendants' alleged misstatements, the Complaint is bereft of factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write-downs on U.S. mortgage-backed securities. Because the "size of an alleged fraud alone does not create an inference of scienter," Plaintiff's repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter. *In re PXRE Group*, 600 F.Supp.2d at 545 (quoting *In re World-Com, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)).

Additionally, CIBC's conduct during the Class Period was not consistent with fraud. *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) (where company "suddenly realized" need to take write-downs after becoming source of public scrutiny). Indeed, CIBC adopted an incremental strategy by taking six write-downs during the Class Period, including pre-announced write-downs expected in two quarterly releases—a fact that contradicts an inference of scienter. *See Rombach v. Chang*, 355 F.3d 164, 176–77 (2d Cir.2004) ("Further, the allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements."); *In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 4752(DC), 1998 WL 150963, at *13 (S.D.N.Y. Apr. 1, 1998) ("If anything, the fact that [the defendant] voluntarily chose to issue a press release earlier than its standard year-end reporting in February undercuts the allegation that defendants were acting recklessly."). If CIBC had a greater obligation to be forthcoming, such

a duty is not apparent from the Complaint. *See Kalnit*, 264 F.3d at 143–44 (requiring facts to be pled in complaint "indicating a clear duty to disclose"). Moreover, Plaintiff has not provided the statements of any corporate insider or confidential informant to buttress its allegations on the fraudulent timing of write downs. *See S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998) (a finding of "reckless disregard for the truth is well supported by ... [Defendant's own affidavit] ... that he included false statements in S.E.C. filings"); *In re NovaGold Res., Inc. Sec. Litig.*, 629 F.Supp.2d 272, 298–300 (S.D.N.Y.2009) (crediting testimony of confidential informants without requiring specificity as to which documents demonstrated the falsity of defendant's statements).

■ Finally, Plaintiff's argument that Defendants failed to adhere to two provisions of the GAAP does not advance its allegations. Generally, vague claims of GAAP violations are insufficient to support an inference of "intent to defraud." *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)). Because the "GAAP is not [a] lucid or encyclopedic set of pre-existing rules ... [and is] [f]ar from a single-source accounting rulebook," reasonable disagreements and deference to business judgment is permissible. *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Given the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent "evidence of 'corresponding fraudulent intent.'" *Novak*, 216 F.3d at 309 (citing *Chill*, 101 F.3d at 270); *see also ECA Local 134*, 553 F.3d at 200 ("Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.") (internal quotation marks omit-

ted); *In re Bristol–Myers,* 312 F.Supp.2d at 565.

Such deference is warranted here. The allegations regarding CIBC's write-downs amount to fundamental disagreements with Defendants' business judgments in a tumultuous economic downturn—claims that are not actionable under Section 10(b) and Rule 10b–5. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *DiLeo,* 901 F.2d at 627 ("Securities laws do not guarantee sound business practices and do not protect investors against reverses.").

### c. The ACA Financial Disclosure

■ Plaintiff's remaining substantive allegations concern Defendants' disclosure (or non-disclosure) that ACA Financial hedged a substantial portion of CIBC's mortgage-backed portfolio. In view of the plunge in ACA Financial's stock price over the summer of 2007, Plaintiff alleges that CIBC should have disclosed that its hedge was a "single A" rated financial guarantor beginning with the July 10 Release.

The allegations regarding ACA Financial are particularly tenuous because they rest on the notion that Defendants failed to disclose internal financial information of a company *other than CIBC. See Defer LP v. Raymond James Financial, Inc.,* 654 F.Supp.2d 204, 218–19 (S.D.N.Y.2009) (declining, for purposes of imputing scienter, to aggregate the knowledge of two separate corporate entities on the basis that they share the same parent). Yet, there is no allegation in the Complaint that Defendants knew of, had access to, or could collect information that ACA Financial was on the verge of bankruptcy. "Even an egregious failure to gather information will not establish 10b–5 liability so long as the defendants did not deliberately shut their eyes to the facts." *In re Bayou Hedge Fund Litig.,* 534 F.Supp.2d 405, 415 (S.D.N.Y.2007) (citation omitted), *aff'd sub nom. South Cherry,* 573 F.3d at 98.

In the three months prior to ACA Financial's bankruptcy, Defendants' only representation even tangentially related to ACA Financial was a statement by McCaughey on the November 5 Conference Call that "the hedges we have [are] good counterparties." This Court declines to extrapolate a year-long fraudulent scheme from this isolated and imprecise remark on a conference call, especially in light of CIBC's subsequent disclosures regarding ACA Financial. *See Goplen v. 51job, Inc.,* 453 F.Supp.2d 759, 773 (S.D.N.Y.2006) (noting scienter inference is "most compelling for problems of the 'type and magnitude [that] likely develop over time, and do not become apparent to management all at once.' ") (quoting *In re Grand Casinos, Inc. Sec. Litig.,* 988 F.Supp. 1273, 1283 (D.Minn.1997)).

Accordingly, Plaintiffs have failed to plead scienter and Defendants' motion to dismiss the § 10(b) and Rule 10b–5 claims is granted.

### III. Section 20(a) Claim

■ To allege a *prima facie* case of liability under § 20(a), a plaintiff must first plead a primary violation by a control person. *In re PXRE Group,* 600 F.Supp.2d at 548 (citing *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998)). Because this Court has determined that no primary violation occurred under Section 10(b) and Rule 10b–5, Defendants' motion to dismiss the § 20(a) claim is granted.

### IV. Leave to Amend

■ In the final footnote of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Plaintiff requests leave to amend its Consolidated Class Action Complaint if it is deficient in any respect. Under Fed.R.Civ.P. 15(a), a

"court should freely give leave when justice so requires." "However, in determining whether leave to amend should be granted, the district court has discretion to consider, *inter alia* the apparent 'futility of amendment.'" *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir.2000) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Plaintiff has already been given one opportunity to submit a Consolidated Class Action Complaint detailing its allegations of fraud against CIBC. Any request for leave to file an amended consolidated class action complaint should conform to this Court's Individual Practices.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted and the Consolidated Class Action Complaint is dismissed in its entirety. The Clerk of Court is directed to terminate all motions pending and mark this case as closed.

SO ORDERED.